IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| PROGRESS RAIL SERVICES CORPORATION, | )<br>)<br>) |
| Plaintiff, | ) 8:05CV98<br>)<br>) |
| v. | )<br>) MEMORANDUM AND ORDER |
| WESTERN HERITAGE CREDIT UNION, and DAVID G. BRADFORD, | )<br>)<br>) |
| Defendants. | ) |

This matter is before the court on defendant Western Heritage Credit Union's motion for partial summary judgment, Filing No. 76. This is an action about a plant manager's alleged deposits of his employer's checks and money into his own personal account at a financial institution to which he remained indebted. Jurisdiction is proper under 28 U.S.C. § 1332, permitting this court jurisdiction over citizens between two states where the amount in controversy exceeds $75,000.

Plaintiff Progress Rail Services Corporation ("Progress Rail") is an Alabama corporation with a principal place of business in Alabama. Progress Rail, a provider of railway products and services, operates manufacturing and repair facilities including a facility in Box Butte County, Nebraska. David G. Bradford ("Bradford") worked as a plant manager at Progress Rail's railcar repair facility in Box Butte County, Nebraska from December 18, 1998, to August 20, 2004. Bradford's responsibilities as plant manager included managing the daily shop business, verifying and approving invoices, tracking costs, and billing customers. Bradford was tasked with remitting all customer payments for the sale of scrap metal to Progress Rail's headquarters in Alabama.

According to Progress Rail, Bradford did not possess the authority to open or maintain bank accounts, deposit, cash or negotiate checks or money in Progress Rail's name, and Progress Rail did not maintain any bank accounts at financial institutions in Box Butte County, Nebraska.  In August 2004, Progress Rail discovered that through forged and authorized endorsements, Bradford deposited checks and/or money from wire transfers made payable to Progress Rail into Bradford's personal bank account with defendant Western Heritage Credit Union ("Western Heritage"), a Nebraska corporation with a principal place of business in Alliance, Nebraska.  Progress Rail also discovered that Bradford sold Progress Rail's scrap metal, locomotives, used equipment, repair services, and land rentals without first recording the sales in Progress Rail's company books.  Progress Rail maintains that Bradford kept for himself Progress Rail's government payments or refunds from the State of Nebraska.

Progress Rail alleges that from approximately January 23, 2002 to August 23, 2004, Bradford intentionally concealed and misrepresented his sale of Progress Rail's property, and Bradford continued to deposit into his personal bank account Progress Rail's checks and money.  During the same time period, Progress Rail maintains that Western Heritage made payments to Bradford or deposited funds in his account totaling $109,798.55 worth of checks and money made payable to Progress Rail.  Progress Rail maintains that Western Heritage failed to investigate or inquire into Bradford's corporate authority to deposit, cash, negotiate, or receive payment for Progress Rail's checks and money, when Western Heritage knew or should have known Bradford did not have such authority.

On May 23, 2003, Bradford allegedly became indebted to Western Heritage after Bradford deposited a check in the amount of $210,000 from Loews Theater Management

2

Corporation, made payable to Bradford. *See* Filing No. 86, Attachment 9, pp. 1-3. Progress Rail alleges that at the time of deposit, Bradford informed Western Heritage that he had received the check as part of an inheritance. *See* Joan Reeves Dep. 85:15-21, Filing No. 86, Attachment No. 7. In the days following the deposit, Western Heritage allowed Bradford to make withdrawals totaling $12,000, despite an internal policy requiring a thirty-day hold on all out-of-state checks. Then, on May 30, 2003, Western Heritage learned that the check was counterfeit, placed a hold on Bradford's account, and made computer notations about the counterfeit check so other employees were placed on alert what items would be accepted from Bradford in the future. On June 2, 2003, Western Heritage's loan department determined that the counterfeit check was part of a scam and immediately made an emergency personal loan of $9,015 to Bradford to cover Western Heritage's $12,000 in losses. *See* Theodore W. Bohlen, Jr. Depo. 48:14 - 54:23, Filing No. 86, Attachment 6. *See also* Filing No. 86, Attachment 8, p. 5 ("encountered scam where we verified [check] (210,000) was ok/ then discovered fraud"). Bradford was to pay back this loan via semi-monthly payments of $137.50 over the course of 44 months. Filing No. 86, Attachment 8, p. 5.

Bradford continued to conduct business with Western Heritage and in August 2003, Bradford deposited a check from NXTevent Registration Services that Western Heritage discovered was drawn on a closed account. Filing No. 86, Attachment 9, p. 4; Joan Reeves Dep. 95:18 - 96:16, Filing No. 86, Attachment No. 7. Bradford deposited another check from payor J.K. in April 2004 ("J.K. check"), and Western Heritage permitted Bradford to withdraw approximately $30,000 from his account without putting a hold on the

3

J.K. check.  Theodore W. Bohlen, Jr. Depo. 73:2 - 75:21, Filing No. 86, Attachment 6. Western Heritage subsequently learned the check was fraudulent.  Filing No. 86, Attachment 7, pp. 1-2.

Over the time period that Bradford deposited bad checks and allegedly continued depositing checks made payable to Progress Rail, Joan Reeves ("Reeves"), a former Western Heritage employee, froze Bradford's account more than once and discussed the bad checks with Western Heritage's management.  Filing No. 85; Joan Reeves Dep. 95:19 - 96:7, 96:24 - 97:24.  Progress Rail contends that Bradford was indebted to Western Heritage and that although it knew Bradford was converting Progress Rail's checks and money, Western Heritage intentionally concealed this "scheme" from Progress Rail in order to obtain reimbursement from Bradford.  According to Progress Rail, Western Heritage terminated employees to conceal this scheme after Progress Rail discovered evidence of it.

Progress Rail brought suit in this court alleging claims of conversion, negligence, unjust enrichment, and money had and received.  Filing No. 1.  Progress Rail then filed an amended complaint adding Bradford to its claims of conversion and unjust enrichment, adding claims against Western Heritage and Bradford for fraudulent concealment and conspiracy to commit fraud, as well as a claim against Bradford for fraudulent misrepresentation.  Filing No. 18.  Western Heritage then filed an answer and cross-claim against Bradford contending that if Western Heritage is found liable, Bradford should be held liable in an amount equal to Western Heritage.  Filing No. 21.

Progress Rail then filed a second amended complaint, Filing No. 44, contending that Western Heritage and Bradford converted Progress Rail's property and deprived Progress

Rail of its property permanently or for an indefinite period of time (Claim I). Progress Rail further contends that Western Heritage converted checks and/or money from wire transfers made payable to Progress Rail in violation of Neb. Rev. Stat. (U.C.C.) § 3-420 (Claim II). In Claim III, Progress Rail asserts that Western Heritage acted negligently by permitting Bradford to deposit checks and/or money from wire transfers without proper identification or confirmation of corporate authority to do so; accepting deposits of forged and unauthorized checks and/or money from wire transfers; allowing Bradford to withdraw funds for his personal use without verification of authority, and failing to conduct a proper investigation of Bradford's purported corporate authority. Progress Rail alleges that Western Heritage and Bradford became unjustly enriched by profiting at Progress Rail's expense when Western Heritage accepted checks and money with Bradford's forged and unauthorized endorsements and Bradford deposited and received the checks and money (Claim IV).

Progress Rail maintains that Western Heritage's collection of the checks and/or wire transfers with Bradford's forged and unauthorized endorsements constitutes money had and received that belongs to Progress Rail (Claim V). In Claim VI, Progress Rail asserts that Western Heritage and Bradford knew Bradford converted Progress Rail's property and deposited into his personal account checks and/or money from wire transfers from the sale of such property. According to Progress Rail, Western Heritage and Bradford intentionally concealed such information from Progress Rail with the intent to deceive, and that Progress Rail was deceived and could not have been aware of the illegal activities because of the intentional concealment (Claim VI). Progress Rail contends that Bradford misrepresented to Progress Rail that he had not sold any of Progress Rail's property when,

in fact, Bradford's representations were false, intentional, and fraudulent (Claim VII). Lastly, Progress Rail maintains that Western Heritage and Bradford engaged in a concerted action, scheme, and common plan by agreement to commit a fraud on Progress Rail (Claim VIII).  Progress Rail argues that Western Heritage and Bradford's actions are imputed to one another as coconspirators and as such, they are jointly and severally liable for Progress Rail's damages.

Also in its second amended complaint, Progress Rail contends that Western Heritage and Bradford have caused Progress Rail to suffer damages of at least $164,786.01.  Progress Rail requests a jury trial and asks this court to enter judgment awarding Progress Rail damages not less than $164,786.01, costs, pre and post-judgment interest, attorney fees, and any other relief the court deems appropriate.

Western Heritage filed an answer to the second amended complaint with the aforementioned cross-claim against Bradford.  Western Heritage maintains that if the allegations in Progress Rail's second amended complaint prove true, then Bradford violated the terms of his depository account agreement, violated his warranties with Western Heritage, and fraudulently misrepresented his authority to endorse the checks and/or money from wire transfers made payable to Progress Rail.  As such, Western Heritage argues that Bradford is liable in equal part to the extent Western Heritage is found liable.

Western Heritage then filed its motion for partial summary judgment at issue, requesting that the court enter summary judgment on all claims based upon checks deposited by Bradford prior to March 3, 2002, as not within the statute of limitations; all claims based on wire transfers identifying Bradford as the beneficiary; and Counts VI

6

(fraudulent concealment) and VIII (conspiracy to commit fraud) of the second amended complaint.  Filing No. 76.  Also before the court is Western Heritage's objection to plaintiff's supplemental index of evidence, Filing No. 123.

**Analysis**

The summary judgment rule is designed to isolate and dispose of factually unsupported claims or defenses.  *Prudential Ins. Co. v. Hinkel*, 121 F.3d 364, 366 (8th Cir. 1997).  A motion for summary judgment is granted when the court determines there is no genuine issue of material fact, and the undisputed facts warrant judgment for the moving party as a matter of law.  Fed. R. Civ. P. 56(c); *Mansker v. TMG Life Ins. Co.*, 54 F.3d 1322, 1326 (8th Cir. 1995).  The burden of establishing the nonexistence of any genuine issue of material fact is on the moving party.  Fed. R. Civ. P. 56(c); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).  In ruling on a motion for summary judgment, a court views all facts in the light most favorable to the nonmoving party and gives the nonmoving party the benefit of all reasonable inferences.  *Prudential*, 121 F.3d at 366.  If the defendant does not meet its initial burden with respect to an issue, summary judgment must be denied notwithstanding the absence of opposing affidavits or other evidence. *Adickes*, 398 U.S. at 159-60; *Cambee's Furniture, Inc. v. Doughboy Recreational Inc.*, 825 F.2d 167, 174 (8th Cir. 1987).

A court must not weigh evidence or make credibility determinations, but must focus on whether a genuine issue of material fact exists for trial.  *Kenney v. Swift Transp. Co.*, 347 F.3d 1041, 1044 (8th Cir. 2003); *see Roberts v. Browning*, 610 F.2d 528, 531 (8th Cir. 1979); *see also United States v. Porter*, 581 F.2d 698, 703 (8th Cir. 1978).  A material fact

is "genuine" if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A court should deny summary judgment where the evidence supports conflicting conclusions. *Kells v. Sinclair Buick-GMC Corp. Truck, Inc.*, 210 F.3d 827, 830 (8th Cir. 2000); *Johnson v. Minnesota Historical Soc.*, 931 F.2d 1239, 1244 (8th Cir. 1991). A court further determines materiality of a disputed fact from the substantive law governing the claim. *Anderson*, 477 U.S. at 248. "Disputes over facts that might affect the outcome of the lawsuit according to applicable substantive law are material." *Liebe v. Norton*, 157 F.3d 574, 578 (8th Cir. 1998).

Once a defendant meets its initial burden of showing there is no genuine issue of material fact, the plaintiff may not rest upon the allegations of his or her pleadings; rather, the plaintiff must set forth specific facts, by affidavit or other evidence, showing that a genuine issue of material fact exists. *See* Fed. R. Civ. P. 56(e); *Chism v. W.R. Grace & Co.*, 158 F.3d 988, 990 (8th Cir. 1998). In order to survive summary judgment, the nonmoving party must make a sufficient showing concerning every essential element of the case on which the nonmoving party bears the burden of proof. *Osborn v. E.F. Hutton & Co.*, 853 F.2d 616, 618 (8th Cir. 1988); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

    **I.    Statute of Limitations**

Section § 3-118 of the Nebraska Uniform Commercial Code provides in part that

> an action (i) for conversion of an instrument, for money had and received, or like action based on conversion, (ii) for breach of warranty, or (iii) to enforce an obligation, duty, or right arising under this article and not governed by this

> section must be commenced within three years after the cause of action accrues.

Neb. Rev. Stat. (U.C.C.) § 3-118.

Section 25-207 states that

> [t]he following actions can only be brought within four years: (1) An action for trespass upon real property; (2) an action for taking, detaining or injuring personal property, including actions for the specific recovery of personal property; (3) an action for an injury to the rights of the plaintiff, not arising on contract, and not hereinafter enumerated; and (4) an action for relief on the ground of fraud, but the cause of action in such case shall not be deemed to have accrued until the discovery of the fraud[.]

Neb. Rev. Stat. § 25-207 (2007).

### A.     Party Arguments

Western Heritage argues that Progress Rail has asserted seven theories of recovery against it including both common law conversion (Claim I) and conversion under the Nebraska Uniform Commercial Code (U.C.C.) (Claim II). Western Heritage argues that all seven theories of recovery are premised on the same underlying acts - Bradford's fraudulent endorsement of Progress Rail's checks and misappropriation of funds by wire. The parties agree that $65,230.26 of Progress Rail's total damage calculation is based on fraudulently endorsed checks deposited prior to March 5, 2002. Filing No. 78, Attachment 5. Western Heritage contends that § 3-118 of the Nebraska Uniform Commercial Code provides a three-year period of limitations applicable to all actions for conversion of an instrument, actions for money had and received, and like actions based on conversion. Western Heritage maintains that the statute of limitations in § 3-118(g) governs all of Progress Rail's claims, with the exclusion of those claims based on misappropriated wire

9

transfers, as the statute of limitations provided for in § 3-118 is a special statute of limitations applicable to cases involving a fraudulently endorsed negotiable instrument.

Progress Rail commenced this action on March 3, 2005, and Western Heritage argues that all claims that occurred prior to March 3, 2002 are barred by § 3-118(g), and Western Heritage is entitled to judgment as a matter of law on all claims based on Bradford's deposit of fraudulently endorsed checks prior to March 3, 2002. Western Heritage argues that the statute of limitations in § 3-118(g) applies to all instrument conversion claims and not just those claims arising under the U.C.C. Western Heritage claims that to the extent common law claims do not conflict with the U.C.C., they can coexist with U.C.C. remedies; otherwise, the U.C.C. displaces common law causes of action. Therefore, Western Heritage maintains that the underlying subject matter of the suit is determinative, rather than the theory of recovery.

Progress Rail responded by stating that § 3-118(g) governs only Progress Rail's U.C.C. conversion claim. Progress Rail claims that in Count VI, it asserts a claim that Western Heritage fraudulently concealed Bradford's deposit of Progress Rail's checks and/or money from wire transfers into his personal bank account. According to Progress Rail, the doctrine of fraudulent concealment renders unavailable a statute of limitations defense. Progress Rail asserts that Western Heritage's purposeful and deceptive concealment of pertinent information caused Progress Rail to not learn of this cause of action until August 2004. Progress Rail argues that Western Heritage is attempting to use its own deception to its advantage by advancing the statute of limitation argument. Progress Rail argues that material questions of fact exist whether from and after June 2, 2003, Western Heritage engaged in deception to conceal Bradford's fraudulent

endorsements from Progress Rail so Western Heritage could offset its own separate loss incurred from Bradford's indebtedness to Western Heritage.

According to Progress Rail, the U.C.C. has not displaced common-law claims for conversion of a negotiable instrument and that such claims coexist with Nebraska's common law.  Further, Progress Rail asserts that § 3-118(g) is not a special statute of limitations that would displace the statute of limitations provided for in § 25-207, the statute applicable to common-law claims.  Progress Rail contends it would be inconsistent for this court to find that the U.C.C. statute of limitations for conversion displaces the common-law statute of limitations for conversion because those statutes do not relate to the same subject matter.  Progress Rail maintains that because the conversion claim and statute of limitations do not displace the common-law conversion claim and statute of limitations, the court should find timely Progress Rail's claims for common-law conversion based on checks and wire transfers after March 3, 2001.

Progress Rail contends that regardless of whether the statute of limitations in either § 3-118(g) or § 25-207 applies, Nebraska's discovery rule tolls the statute of limitations, and the discovery rule applies to conversion cases involving fraud.  Progress Rail states that "the discovery rule is an exception to the strict time periods delineated by various statutes of limitations . . . ."[1]  Progress Rail maintains the discovery rule exists because without it, it would be manifestly unjust for the statute of limitations to run where the injury is not obvious and the individual is unaware of the damage.  Progress Rail argues that

---

[1] Progress Rail obtained the quoted material from the case *Duerr v. Armstrong*, 2003 Neb. App. LEXIS 99 (Neb. Ct. App. 2003).

11

substantial questions of fact exist regarding whether Western Heritage fraudulently concealed Bradford's wrongful conversion of Progress Rail's property to satisfy Bradford's indebtedness to Western Heritage.

In response to Progress Rail's discovery rule argument, Western Heritage argues the discovery rule does not apply to cases based on fraudulent endorsement. Alternatively, Western Heritage states that even if the discovery rule applies, Progress Rail could not avail itself of the discovery rule's protections because it did not advance sufficient evidence of fraud. Western Heritage further contends that Progress Rail could not invoke the discovery rule doctrine to at least a portion of the checks because Progress Rail was aware of the wrongdoing prior to the expiration of the limitations period.

### B. Discussion

A plaintiff proves fraudulent concealment by proving the "defendant has, either by deception or by a violation of a duty, concealed from the plaintiff material facts which prevent the plaintiff from discovering the misconduct." *Andres v. McNeil Co.*, 707 N.W.2d 777, 787 (Neb. 2005). "[T]he doctrine of fraudulent concealment may render a statute of limitations defense unavailable." *Andres*, 707 N.W.2d at 786. "[F]raudulent concealment can apply regardless of the nature of the cause of action." *Id.* at 787. Generally, a plaintiff asserting the doctrine of fraudulent concealment must prove concealment by an affirmative act or misrepresentation. *Id.* Additionally, for the plaintiff to estop the defendant from claiming a statute of limitations defense, the plaintiff must have exercised due diligence to discover the plaintiff's cause of action prior to expiration of the statute of limitations. *Id.*

The "discovery rule" provides that the statute of limitations "begins to run when the facts constituting fraud were discovered or, by reasonable diligence, should have been discovered." *Hope v. Klabal*, 457 F.3d 784, 791 (8th Cir. 2006) (internal quotations omitted). *See Shlien v. Bd. of Regents*, 263 Neb. 465, 473 (Neb. 2002) (the discovery rule is not applicable where the plaintiff discovers, "or in the exercise of reasonable diligence should have discovered, the injury within the initial period of limitations running from the wrongful act or omission."); *Rodrigue v. Olin Emples. Credit Union*, 406 F.3d 434, 444 (7th Cir. 2005) ("the discovery rule tolls the statute of limitations until such time as the plaintiff knew or reasonably should have known that she has a cause of action for her injury"); *John Hancock Fin. Servs. v. Old Kent Bank*, 346 F.3d 727, 734 (6th Cir. 2003) (the discovery rule prevents "unjust results when a plaintiff would otherwise be denied a reasonable opportunity to bring suit due to the latent nature of the injury or the inability to discover the causal connection between the injury and the defendant's action").

The Nebraska Supreme Court has held that a U.C.C. claim for conversion under the U.C.C. does not "displace the common law action for conversion of a negotiable instrument, but coexists with Nebraska's common law." *Hecker v. Ravenna Bank*, 468 N.W.2d 88, 95 (Neb. 1991). Regarding the *Hecker* case, the court acknowledges that the Nebraska Supreme Court decided *Hecker* prior to the enactment of § 3-118(g), and the *Hecker* case did not involve a fraudulent endorsement. However, in the unpublished, June 8, 2004, District Court of Scotts Bluff County, Nebraska case of *Insurance Store, Inc., v. First National Bank*, *see* Filing No. 120, Attachment 1, the court notes the same time-frame distinction and states a plaintiff can assert theories of recovery under both common law

13

and the U.C.C., and the U.C.C. has not preempted the common law causes of action of negligence or conversion. It is the inclusion of this case in Progress Rail's supplemental index of evidence to which Western Heritage objects. Filing Nos. 120, 123. The court overrules Western Heritage's objection, but acknowledges that this case is merely persuasive authority. The court finds that such a case is representative of Nebraska courts upholding the distinction between U.C.C. and common law causes of action.

Accordingly, for purposes of summary judgment, the court declines the opportunity to apply § 3-118 to find that all checks deposited by Bradford prior to March 3, 2002, are barred by the statute of limitations. The court finds summary judgment is not warranted as genuine issues of material fact exist concerning the allegations of fraud sufficient to invoke the discovery rule. Specifically, the court refers to evidence that despite Western Heritage's policy to the contrary, Western Heritage permitted Bradford to make withdrawals totaling $12,000 after depositing a $210,000 check, and approximately $30,000 after depositing the J.K. check, despite Western Heritage's policy requiring a hold on such checks for thirty days. *See* Theodore W. Bohlen, Jr. Depo. 42:10 - 43:4, 73:2 - 75:21, Filing No. 86, Attachment 6. Of additional concern is Western Heritage's notation that it discovered fraud existed after Bradford deposited the $210,000 check. *See* Filing No. 86, Attachment 8, p. 5 ("encountered scam where we verified [check] (210,000) was ok/ then discovered fraud"). Based on the evidence, whether Western Heritage and Bradford engaged in fraudulent concealment and conspiracy to commit fraud is subject to conflicting conclusions. Accordingly, the court finds that the parties' arguments and the admissibility of the checks at issue are more appropriately the subject of evidentiary issues to be dealt with at the time of trial.

### II.     Wire Transfers

Western Heritage contends that by conducting discovery, the parties discovered that Progress Rail was not the intended beneficiary of the wire transfers alleged in the complaint. Rather, Western Heritage claims that the wire transfers identify Bradford and his account number as the beneficiary. *See* Theodore W. Bohlen, Jr. Depo. 21:12 - 23:16, Filing No. 86, Attachment 6. Western Heritage argues that it is Progress Rail's burden to demonstrate that Western Heritage improperly paid Bradford pursuant to the wire transfer orders. Western Heritage requests that the court enter summary judgment that Progress Rail is unable to meet its burden regarding the wire transfers.

Progress Rail maintains a material question of fact exists regarding the wire transfers at issue and Western Heritage admitted that it received two wire transfers "made payable to Progress Rail." Therefore, Progress Rail contends that whether Western Heritage improperly paid the proceeds of the wire transfers to Bradford remains a factual question for the jury to determine. Progress Rail states that even if a material question does not exist, the U.C.C. does not diminish Progress Rail's additional common-law claims. However, in its reply brief, Western Heritage claims that Progress Rail did not advance any credible evidence to refute the alleged fact that the wire transfer orders identified Bradford as the beneficiary. Western Heritage maintains the wire transfer orders indicated Bradford was the beneficiary and, therefore, Western Heritage had an obligation to pay Bradford.

Upon receipt of a wire transfer order, a bank is obligated to pay the amount of the order to the beneficiary of the order. Neb. Rev. Stat. U.C.C. §§ 4A-103, 4A-404 (2007). The court has reviewed the evidence submitted by both parties, and specifically, Western

Heritage's inclusion of copies of the two wire transfers at issue. *See* Filing No. 78, Attachment 3 ("exhibit A").[2] Barring any evidence to the contrary, the court concludes that no genuine issue of material fact exists that Bradford is the named beneficiary of both wire transfers. Progress Rail has not submitted any evidence to establish that Western Heritage had either actual knowledge or notice of facts sufficient to put Western Heritage on inquiry that the wire transfers represented proceeds from the improper sale of property owned by Progress Rail. *See Miracle Hills Centre Ltd. Partnership v. Nebraska Nat'l Bank*, 434 N.W.2d 304, 306 (Neb. 1989). Thus, the court grants summary judgment in favor of Western Heritage to find Progress Rail may not proceed on claims based on the wire transfers.

### III.    Claim VI (Fraudulent Concealment)

Western Heritage argues Progress Rail's fraudulent concealment claim fails because the evidence supports the conclusion Western Heritage did not have the requisite intent to commit fraud. Furthermore, Western Heritage claims that it did not owe Progress Rail a duty to disclose because a fiduciary relationship did not exist between Progress Rail and Western Heritage. Western Heritage contends that even if a duty to disclose existed, neither Western Heritage's management nor its employees knew Bradford wrongfully converted checks payable to Progress Rail until September 2004. Similarly, Western Heritage asserts it was unaware that the wire transfers deposited in Bradford's account

---

[2] The court notes the copies of the wire transfers are redacted, and Dennis Leeper, Vice-President of Western Heritage, explains in his Declaration, Filing No. 78, Attachment 2, ¶ 5, that "the account numbers have been redacted to protect the privacy of the parties involved." Such a redaction appears above "David Bradford" on the line designated "[4200] Beneficiary:". Progress Rail does not contend that this redaction is Progress Rail's name or account number. *See also* Theodore W. Bohlen, Jr. Depo. 23:1-8, Filing No. 86, Attachment 6.

represented proceeds from an improper sale of Progress Rail's property. Therefore, Western Heritage maintains insufficient evidence exists to establish that Western Heritage was complicit in Bradford's alleged fraud due to Western Heritage's lack of knowledge and awareness.

Progress Rail responded claiming that Western Heritage owed a clear duty to disclose to Progress Rail, and such a duty arises between parties to a business transaction. This is so, Progress Rail claims, because Progress Rail was a party to the transactions between Bradford and Western Heritage as the payee on all fraudulently endorsed checks and/or wire transfers cashed or deposited by Bradford. Therefore, Progress Rail contends a legal relationship with Western Heritage existed when, as a party to an instrument, Bradford presented the instrument to Western Heritage who in turn completed the transaction.

Progress Rail argues that Bradford wrote bad checks and that Reeves froze Bradford's account more than once and discussed the bad checks with Western Heritage's management. In spite of the bad checks, Progress Rail alleges that Western Heritage violated its own internal procedures because it made no effort to verify Bradford's corporate authority, and Western Heritage accepted additional checks payable to Progress Rail and allowed Bradford to make withdrawals against the checks. Accordingly, Progress Rail maintains Western Heritage management knew of Bradford's involvement in a financial scam.

In its reply brief, Western Heritage contends that a relationship between it and Progress Rail does not exist. Rather, Western Heritage claims this case involves routine commercial transactions where no affirmative statements were made, no special

17

relationship existed, and no special circumstances justified the imposition of a duty. Western Heritage argues that once Bradford endorsed the checks in Progress Rail's name, the checks became bearer paper that upon presentation for deposit, affected only the legal relationship between Bradford and Western Heritage. Moreover, Western Heritage maintains that Progress Rail was not a party to the transaction between Western Heritage and Bradford and any third-party banks involved in the collection process.

Western Heritage maintains that it continued accepting checks from Bradford after 2003 because it had no knowledge that Bradford had endorsed Progress Rail's checks without Progress Rail's knowledge, consent, or authorization. Western Heritage states that whether it should have accepted the checks endorsed by Bradford remains a separate question; the issue, Western Heritage argues, is that no evidence supports Progress Rail's claims that Western Heritage participated in the fraud.

The court disagrees and finds that genuine issues of material fact exist whether Western Heritage intended and acted to commit fraud. Reeves testified in her deposition that she froze Bradford's account, and that she discussed her suspicions about fraud with management. Theodore W. Bohlen, Western Heritage's president, stated in his deposition that Western Heritage loaned money to Bradford to cover Western Heritage's loss from the $210,000 counterfeit check, but continued doing business with Bradford and permitting withdrawals on subsequent check deposits. Such actions by Western Heritage support conflicting conclusions about the existence of fraud in this case. Therefore, summary judgment is denied and a determination of whether Western Heritage fraudulently concealed Bradford's conversion of Progress Rail's checks remains an issue for trial.

## IV.     Claim VIII (Conspiracy to Commit Fraud)

Western Heritage argues that conspiracy is not a separate and independent tort, but dependent on an underlying tort. Therefore, Western Heritage contends that its arguments regarding summary judgment on Claim VI apply to its request for summary judgment on Claim VIII. In other words, Western Heritage maintains that because Progress Rail cannot produce evidence of its fraud claim, Progress Rail cannot succeed on its conspiracy to commit fraud claim. Alternatively, Western Heritage asserts that even if evidence of fraud exists, it does not prove the existence of a civil conspiracy between Western Heritage and Bradford. Western Heritage argues it did not agree with Bradford to convert the negotiable instruments or the wire transfer proceeds to satisfy Bradford's debt to Western Heritage. Western Heritage maintains no evidence exists demonstrating a "preconceived plan and unity of design and purpose" to convert Progress Rail's checks. Rather, Western Heritage contends that based on good faith belief of Bradford's authority to endorse and authorize Progress Rail's checks, it accepted for deposit into Bradford's personal account Progress Rail's checks. Such evidence, Western Heritage claims, suggests no agreement to harm Progress Rail.

Progress Rail argues that based on the evidence and premised on its arguments as it pertains to Claim VI, a jury will conclude a preconceived plan existed between Western Heritage and Bradford to convert Progress Rail's checks and offset Bradford's debt to Western Heritage. Therefore, Progress Rail requests that the court deny Western Heritage's motion for partial summary judgment regarding Claims VI and VIII.

The general rule in Nebraska is that civil conspiracy is not a separate tort; rather, conspiracy is dependent upon the existence of an underlying tort. *Hatcher v. Bellevue*

19

*Volunteer Fire Dep't*, 628 N.W.2d 685, 696 (Neb. 2001). A plaintiff asserting civil conspiracy must allege the conspiracy and the doing of the wrongful acts, as well as facts showing that damage resulted therefrom. *Hatcher v. Bellevue Volunteer Fire Dep't*, 628 N.W.2d 685, 696 (Neb. 2001). Pursuant to the court's findings on summary judgment on Progress Rail's fraudulent concealment claim, the court denies summary judgment on Progress Rail's conspiracy allegation. Given the evidence of counterfeit checks and Western Heritage permitting Bradford to withdraw funds from his account without a hold placed on said checks, with corresponding evidence of Bradford's indebtedness to Western Heritage, the court finds genuine issues of material facts exist. Whether Western Heritage acted in concert with Bradford or whether Western Heritage acted in good faith accepting for deposit Bradford's presentation of Progress Rail's checks remains an issue for determination at trial.

ACCORDINGLY, IT IS ORDERED:

1. Defendant Western Heritage Credit Union's motion for partial summary judgment, Filing No. 76, is granted in part and denied in part as set forth herein; and

2. Western Heritage's objection to Progress Rail's supplemental index of evidence, Filing No. 123, is overruled.

DATED this 26th day of March, 2007.

BY THE COURT:

s/ Joseph F. Bataillon
JOSEPH F. BATAILLON
Chief United States District Judge